AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

**FILED**
At Albuquerque NM

for the

District of New Mexico

JUL **6** 2016

MATTHEW J. DYKMAN
CLERK

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

1703 Camino Del Sol, Gallup, New Mexico.  More fully
described in Attachment A.

)
)
)
)
)
)

Case No.  16 - MR - 500

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Please see attachment A.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:
Please see attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 (a)(1) | Manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. |

The application is based on these facts:
Please see attached Affidavit of DEA Special Agent Jeffrey Mauldin.  This affidavit was approved by AUSA Jennifer Rozzoni.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA Special Agent Jeffrey Mauldin
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 6, 2016

_____
*Judge's signature*

City and state:  Albuquerque, New Mexico

United States Magistrate Judge Karen B. Molzen
*Printed name and title*

### AFFIDAVIT OF DEA SPECIAL AGENT JEFFREY MAULDIN

I, Jeffrey A. Mauldin, United States Department of Justice, Drug Enforcement Administration
(DEA), being first duly sworn state as follows:

### INTRODUCTION

1.      This affidavit is written in support of an application for a search warrant for 1703 Camino
Del Sol, Gallup, New Mexico. The residence is more particularly described as a single-family
dwelling, specifically a red brick and tan siding bi-level house. The residence is mostly
surrounded by a white picket fence around the front and a wooden stockade fence around the
back. There are two separate white garage doors on the south end of the residence which face
east. The front door is near the middle of the residence at the junction of the single story and two
story section of the house. The numeric numbers for the residence are clearly visible to the north
of the front door on the lower portion of the second story. The residence is hereafter identified
as "the SUBJECT LOCATION."

2.      I am currently investigating a marijuana, methamphetamine, and cocaine distribution case
involving numerous individuals including but not limited to Ernest MADRID, Juan GARCIA,
Joseph DONALDSON, and David CORDOVA. The facts and information set forth in this
affidavit are based upon my personal knowledge and observations obtained during this
investigation, conversations with other officers, and wire interceptions of MADRID'S cellular
telephone.

### AFFIANT'S BACKGROUND

3.      I am a Special Agent of the Drug Enforcement Administration, (DEA), United States
Department of Justice. I have been assigned to the Albuquerque District Office, in Albuquerque,
New Mexico, since January of 2005. I have been employed as a Special Agent since August of
2004. As a Special Agent, I attended a 16-week academy, during which I received
approximately 500 hours of specialized narcotics training in Quantico, Virginia. Upon
graduation from the DEA academy I was assigned to the Albuquerque District Office to conduct
criminal investigations involving the distribution of controlled substances. I have been involved

1

with numerous controlled substances investigations, to include being the Affiant on several Federal Title III Affidavits and Search Warrants. I have also been assigned to the DEA Tactical Diversion Squad, which is responsible for investigating DEA registrants, such as licensed medical practitioners, pharmacies, and pharmaceutical distributors. Furthermore, I have investigated numerous cases involving prescription forgery, by individuals and organizations, involved in the illegal distribution of prescription based controlled substances. Prior to my employment with DEA, I was employed as a Police Officer in Midwest City, Oklahoma, from September 1997 to August of 2004. In that capacity I earned Intermediate and Advanced Police Officer certifications; became a Drug Recognition Expert, certified by the National Highway Transportation and Safety Board along with the International Association of Chiefs of Police; and attended over one hundred hours of specialized narcotics training sponsored by the Association of Oklahoma Narcotics Enforcers.

4.     Based upon my training and experience along with conversations with other law enforcement officers experienced in investigating conspiracy to manufacture, distribute, and possession with intent to distribute controlled substances, I have learned the following:

a) Drug dealers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers, and co-conspirators. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, IOU's, miscellaneous notes, money orders, customer lists, and telephone address books.

b) These records can reflect names, addresses, and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances, customer lists, and amounts of money owed to the trafficker by his customers, and by the trafficker to his suppliers.

2

c) Records often indicate locations and distribution points of controlled substances, and the purchase of materials, supplies, and articles used by the trafficker and co-conspirators in the distribution of controlled substances.

d) Records frequently include the identification of properties such as real property or vehicles owned, rented, leased, controlled, or otherwise utilized by the trafficker and his co-conspirators in the distribution of controlled substances. These records include property rental and ownership records such as deed of trust, and lease and purchase agreements, and vehicle registration, rental and ownership information.

e) These items are stored by drug dealers on their person, in their residences and surrounding garages, outbuildings, carports, yards and cars.

f) Drug dealers usually sell their product for cash. Because pound quantities of controlled substances can sell for thousands of dollars, even at the wholesale level, dealers often have thousands of dollars in cash on hand both as proceeds of sales and to purchase their own supplies. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

g) Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in, or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds, vehicle registrations, and mortgage receipts.

h) Drug dealers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, including firearms and large sums of money, along with their drugs. These photographs and videos are often contained on cellular telephones, computers, and other electronic media such as external drives. They often maintain these photographs and/or videos on their person, in their residences, vehicles, storage or outbuildings, garages, and yards.

i) Drug dealers often maintain firearms and ammunition on their person or in their homes, or cars to protect themselves and their drugs and their drug profits. They also may

3

maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, and instruction manuals and other documentation for firearms and ammunition.

j) Drug dealers utilize cellular telephones daily to direct associates in the procurement, packaging, sale and delivery of controlled substances. With the advent of modern cellular telephones capable of storing large amounts of data, drug dealers often store drug ledgers, associates names, addresses, and contact numbers, along with photographs and videos on the mobile devices. These devices can be stored in any location readily available to the drug dealer, to include such places as a residence, vehicles, storage or outbuildings, and yards.

k) Drug dealers often hide large quantities of controlled substances throughout their property. Drug dealers often conceal drugs, US currency, packaging materials, and records in their residence, vehicles, storage or outbuildings, garages, and yards.

l) Drug dealers often utilize the property of other individuals to store large quantities of drugs in an active attempt to minimize their involvement in illegal activities. For example, drug dealers often utilize legitimate storage lockers or property belonging to other individuals to store large quantities of drugs. The individuals may be involved in the conspiracy to distribute illegal drugs or they may be innocent unwitting individuals engaged in legitimate business.

## UNDERLYING FACTS AND CIRCUMSTANCES

5.     On July 6, 2014, at approximately 7:18PM, the McKinley County Sheriff's office responded to a call for service involving physical altercation involving a firearm at 901 Draco Street in Gamerco, New Mexico. Upon arrival Deputies Jeff Marez and James Garylie made contact with Joseph DONALDSON and Katrina Sam. Sam told deputies that she and DONLADSON had got into an argument which escalated into a physical altercation. Sam said that DONALDSON had obtained a handgun and pointed it at her head. When she called the police Sam said that DONALDSON put the handgun in his safe. Deputies documented in their report that DONALDSON had scratches and blood on his face. Sam said that she scratched DONALDSON'S face in an attempt to protect herself. Deputies asked DONALDSON if he had any firearms, DONALDSON said that he was a convicted felon and was not allowed to have

firearms. Deputies located a safe in a closet at the area in which the physical altercation took place. Deputies asked DONALDSON if he would open the safe and show them that he did not have a firearm; DONALDSON told them to get a warrant. Deputies located two plastic baggies containing a white crystalline substance and one baggie containing a green leafy substance on the floor near the safe. DONALDSON was arrested and the safe was seized so that deputies could obtain a search warrant.

6.      On July 8, 2016, McKinley County Deputy Pat Salazar obtained the reports of the incident. Deputy Salazar subsequently viewed the safe and smelled the odor of marijuana originating from the safe. Deputy Salazar also utilized his drug certified K-9 "Cedar" to perform sniff the safe. "Cedar" alerted to the presence of drugs in the safe. Deputy Salazar applied for and was granted a warrant to search the safe. On July 8, 2016, Deputy Salazar gained access to the safe and located marijuana in plastic bags and glass jars, $21,934.00 in US currency, and a 9mm Taurus handgun; the handgun had previously been reported stolen. Also inside the safe were checks, and a vehicle receipt in the name of DONALDSON.

7.      On March 17, 2016, United States District Judge James O. Browning authorized the interception of cellular telephone number 480-737-7472, utilized by a source of supply (SOS) known as TATUADO, based upon an affidavit by your affiant.

8.      On March 21, 2016, at approximately 10:59AM, session number 263 was intercepted in which DONALDSON called 480-737-7472 utilizing 505-593-3094 and spoke to TATUADO.

***

DONALDSON:  I'll go …I'll call Thursday.  Then we can see the stuff, and then if you could put it away, and then I get it Sunday when I come home.

TATUADO:  "Okay.  You…"  [Voices overlap.]

DONALDSON:  "'Cause I got that…I've got twe'…I've got twenty."

TATUADO:  "Uh-huh."  [Voices overlap.]

DONALDSON:  "So I don't know if you can do forty or fifty, but I…I got…"

TATUADO: "You have [unintelligible]."

DONALDSON: "…Twenty, 'could."

TATUADO: "We're gonna have to give the fifty.  Maybe fifty, but I don't know.  Ma'…depends."  [Voices overlap.]

DONALDSON: "Okay."

TATUADO: "You know?"

DONALDSON: "Well…let's see…"  [Voices overlap.]

TATUADO: "I can wait."

DONALDSON: "…I got…I'm gonna have twenty thousand for you.  So I got that right here right now."

TATUADO: "Okey-dokey."  [Voices overlap.]

DONALDSON: "So I'll give you that.  Okay?"

TATUADO: "All right.  Just call me…"  [Voices overlap.]

DONALDSON: Alright.  I…"

TATUADO: "…When you're in the town."

DONALDSON: "Okay.  I'll talk to you Thursday."  [Voices overlap.]

TATUADO: "A'…a'…alright."

DONALDSON: "Alright.  Bye."

9.  In this call, DONALDSON is telling TATUADO that he has twenty thousand dollars to purchase marijuana from TATUADO in Phoenix.  Based on other calls, I know that DONALDSON had asked TATUADO for forty pounds of marijuana.  TATUADO then told DONALDSON that he may be able to get fifty pounds, but he was not sure.  DONALDSON wanted to see the marijuana on Thursday and have TATUADO store the marijuana until Sunday because DONALDSON had his children with him and did not want to store the marijuana in a

hotel room with his children.  They agreed to talk again on Thursday when DONALDSON got into Phoenix.

10.    On March 24, 2016, at approximately 4:05PM, session number 709 was intercepted in which DONALDSON called 480-737-7472 utilizing 505-593-3094 and spoke to TATUADO.

***

[Background voices unknown male and female to children, the conversation was unintelligible.]

TATUADO:  "Hello."

DONALDSON:  "Hey, where are you?"

TATUADO:  "I on the way.  I'll see you uh, five, seven minutes."

DONALDSON:  "Okay I'm here getting gas but we're already filled up."

TATUADO:  "Okay."  [Voices overlap.]

DONALDSON:  "I'll be here."

TATUADO:  "Park it with…in the Walgreens.  Somewhere."

DONALDSON:  "Well, we'll wait right here."  [Voices overlap.]

TATUADO:  "All right that's [unintelligible.]"

DONALDSON:  "…We're gonna go inside…use the restroom and stuff."
[Voices overlap.]

TATUADO:  "Okay.  O…okay I see you uh, five minutes.  Ah, five, seven minutes."

DONALDSON:  "All right, bye."

11.     This call confirms the previous call, in that DONALDSON and TATUADO agree to meet at the Walgreens in "five to seven minutes" after the call. The call also confirms that DONALDSON had his children present with him for the marijuana transaction.

12.     On April 15, 2016, United States District Judge James O. Browning authorized the interception of cellular telephone number 505-409-0666, utilized by Ernest MADRID, a distributor of methamphetamine in Gallup, NM, based upon an affidavit by your affiant. On April 27, 2016, MADRID changed his cellular telephone number from 505-409-0666 to 505-728-1834, but kept the cellular telephone device.

13.     On April 19, 2016, at approximately 11:40AM, session number 436 was intercepted in which MADRID called 505-593-3094 utilizing 505-409-0666 and spoke to DONALDSON.

                                            ***

        DONALDSON: "Just getting ready to go to the Social Security Office, and then…they told me go by RAK'S. Might have a job."

        MADRID: "Oh. I…I was gonna see if I could put my truck in the back of your yard again, since I got my other truck back." [Background noise.]

        DONALDSON: "Oh. D' you get it running?"

        MADRID: "Yeah. It's good and going. [Pause.] It's just…" [Voices overlap.]

        DONALDSON: "Yeah."

        MADRID: "…That they always watch me in that red truck, you know? [Background noise.] I'd just finally like to…it to just disappear from town."

        DONALDSON: "All right. Um, let me…prob'ly 'bout like two or three. I'll let…I'll call…"

                                            ***

14.     In this call, MADRID asked DONALDSON if he could secret his red Dodge pickup in DONALDSON'S backyard, behind the large wooden stockade fence. MADRID tells DONALDSON that "they always watch me" meaning that law enforcement watches him when he drives the red Dodge. Agents have since confirmed that there is a red pickup parked behind DONALDSON'S stockade fence behind his residence. However agents are unable to confirm

that the vehicle in fact belongs to MADRID.  Furthermore, based upon intercepted calls and Deputies from the McKinley County Sheriff's Office, it is believed that one of MADRID'S associates was in possession of the vehicle during the last part of June and the beginning of July.

15.     On May 5, 2016, at approximately 5:42PM, session number 1980 was intercepted in which DONALDSON called 505-728-1834 utilizing 505-593-3094 and spoke to MADRID.

                                                   ***

DONALDSON: "Hey.  Is that Eddie legit?  Did...he's telling me he's got some good stuff for six hundred, and if I get a lot, it'll be cheaper."

MADRID: "Well yeah.  He doesn't lie.  He's probably telling you the truth.  I don't know.

DONALDSON: "Yeah.  But I don't wanna get burned bro'.  You know if I go...he said twenty for twelve.  I could start with that.  He sayin' it...it's killer, but fuck that's a lot of money if something were to happen.  I know he won't do that do you, but [pause] you know, I mean I don't know."

MADRID: "Yeah.  Why is he gonna burn you?  You're gonna be right there when the weed comes.  You not gonna just be [unintelligible]."  [Voices overlap.]

                                                   ***

16.     In this call, DONALDSON is asking MADRID if "Eddie" (Edward HAUSNER) is "legit," that is, asking of HAUSNER will in fact have marijuana for DONALDSON to buy. DONALDSON is worried that HAUSNER will take his money and not give him the marijuana. DONALDSON told HAUSNER that he would sell him marijuana for $600.00 per pound. DONALDSON is ordering twenty pounds of marijuana and is agreeing to pay HAUSNER $12,000.00 dollars.

17.     On May 5, 2016, at approximately 5:49PM, session number 1981 was intercepted in which MADRID called 520-809-0956 utilizing 505-728-1834 and spoke to HAUSNER.

                                                   ***

HAUSNER: "Hello."

                                                     9

MADRID: "Hey."

HAUSNER: "Huh?"

MADRID: "That Joseph, you're gonna sell him twenty pounds of weed?"

HAUSNER: "I could get him a hundred pounds, if he wants, bro'"

MADRID: "Yeah. He just wants to be right there and look at the s'...the weed and make sure they're not buring him, and he'll buy 'em."

HAUSNER: "Yeah. Well Y'...I...I want him to come get 'em though. You know what I mean?"

MADRID: "Yeah."

HAUSNER: "Yeah." [Unintelligible.] [Voices overlap.]

MADRID: "Yeah."

HAUSNER: "...He'll come get 'em. That's the only reason why I texted to him. But he was all, 'Can you bring me twenty of them, and I'll get 'em?' But this is good bud, bro'. No...those fuckin'...[pause] all his customers will be fuckin' happier than a motherfucker for real." [Voices overlap.]

***

MADRID: "He was all, 'Well I don't wanna get killed or robbed. Those guys don't even like me as it is.' I go, 'Man, the dude...the dude's not gonna...the dudes not gonna [unintelligible] you." [Voices overlap.]

HAUSNER: "Not even! I wouldn't...I like him, bro'. Tell him, Ernie. Tell him I wouldn't put him in that predicament [unintelligible] [Background noise.] fuckin' I'd never burn nobody. I'm not gonna rob nobody, bro'. I believe in karma, bro'. [Pause] so tell him, 'Ed said he's straight up, bro'. He gots stuff, but he...he ain't gonna try to fuckin' burn you or let nobody try to jack you, bro'. No fuckin' bullshit, ey. No fuckin' way.' [Background: Male voice.] 'These fuckers are legit motherfuckers.'"

***

18.     On May 5, 2016, at approximately 5:51PM, session number 1982 was intercepted in which MADRID called 505-593-3094 utilizing 505-728-1834 and spoke to DONALDSON.

*** 

DONALDSON: "What's up?" [Pause.]

MADRID: "Yeah. He says it's a legit deal, ey. He said if you go over there, you can get whatever you want. And he said that, uh, he'll be right there. You'll be right there. Nobody's gonna burn you. He's not gonna let nobody try to kill you or fuckin' rob you guys or nothin'."

DONALDSON: "Well as long as you go with me, I know everything'll be just fine. Yes you can!" [Voices overlap.]

*** 

MADRID: "...five different...five different other people tried to call me, and then, since you're my friend, so I called my other friend to see if it's legit." [Voices overlap.]

DONALDSON: "All right. Thanks for calling. I'm just joking..." [Voices overlap.]

MADRID: "You know?"

DONALDSON: "...With you. But all right." [Voices overlap.]

MADRID: "It's a straight up legit deal. I...I know the dude's not gonna burn you. Why does he have..." [Voices overlap.]

DONALDSON: "Okay."

*** 

19.     In this call, MADRID is explaining to DONALDSON that he had just talked to HAUSNER and that HAUSNER assured him that the deal was legitimate.

20.     On May 27, 2016, United States District Judge James O. Browning authorized the interception of cellular telephone number 505-728-1834, utilized by Ernest MADRID, a distributor of methamphetamine in Gallup, NM, based upon an affidavit by your affiant.

21.     On June 1, 2016, at approximately 1:25PM, session number 635 was intercepted in which MADRID called 505-593-3094 utilizing 505-728-1834 and spoke to DONALDSON.

11

*** 

DONALDSON:  "Hello."

MADRID:  "Joe, do you have a receipt where we made the payment last month?"

DONALDSON:  "Yeah.  I have it somewhere."

MADRID:  "All right.  Because this lady's tryin' to call me and say that I owe a thousand dollar because I was L'…[pause] I didn't pay?"

DONALDSON:  "Yeah."

MADRID:  "Remember how…"  [Voices overlap.]

DONALDSON:  "It's not late no thousand dollars."

MADRID:  "Yeah.  I'm not payin'.  I'm, up to date."

DONALDSON:  "Yeah.  You're up to date.  Your payment…"  [Voices overlap.]

MADRID:  "I…"

DONALDSON:  "…Your bill payment will be due now for this month, but…[pause] but…"  [Voices overlap.]

MADRID:  "Yeah.  But…"

DONALDSON:  "…I'll get the receipt."

MADRID:  "Yeah.  Because…"  [Voices overlap.]

DONALDSON:  "I have it."

MADRID:  "…That lady…that lady's tryin' to say that I don't pay, that I owe the bank a thousand dollar, but 'member when you fuckin' went and they were tryin' to say, well, they didn't wanna do it because it was so late and however, and they were tryin' to say, 'Pay this month and this month?'  They…"  [Voices overlap.]

DONALDSON:  "Yeah."

MADRID:  "…Wanted me to pay a thousand dollars for last month and the month ahead right away."  [Voices overlap.]

DONALDSON:  "Yeah."

12

MADRID: "But we didn't do that. 'Member?"

DONALDSON: "Yup."

MADRID: "Well that…that lady's tryin' to tell me I owe a thousand dollars."

DONALDSON: "No." [Voices overlap.]

MADRID: "But she got a letter that was old, and…" [Voices overlap.]

DONALDSON: "Yeah." [Unintelligible.]

MADRID: "…That I don't owe the fuckin' thousand dollars."

DONALDSON: "Well if you want…" [Voices overlap.]

MADRID: "Because this lady's always…"

DONALDSON: "…Let's go."

MADRID: "Because this lady's always tryin' to get over on me, man, and I know that I fuckin' pay my bills all the time, bro'. There ain't no fuckin' way that I'm not u'…" [Voices overlap.]

DONALDSON: "Allright. Well you could go with me to the bank. That way we can get it squared away, but I'm showing this people a trailer. So [pause] I'll talk to you in a little bit."

MADRID: "All right. But you have that receipt though, right?"

DONALDSON: "Yeah. I have all the receipts." [Voices overlap.]

MADRID: "O'…okay. Yeah. So all right."

DONALDSON: " A'right. A'right. Later."

End of call.

22.     In this call, MADRID is telling DONALDSON that he received a letter from the bank stating that he owed a thousand dollars. MADRID had been late on a payment and the bank wanted the current amount due and the next month's payment at the same time. MADRID is angry and asked DONALDSON if he had the receipts showing the payment MADRID has made on his house. DONALDSON said "Yeah. I have all of the receipts." From other intercepted calls, I know that MADRID pays DONALDSON who then takes the money to the bank to pay

13

MADRID'S mortgage. I also know from intercepted telephone conversations that neither MADRID nor DONALDSON have a legitimate job and that the receipts held by DONALDSON show proceeds from illegal drug sales from MADRID.

## **TECHNICAL TERMS**

23.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a) IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b) Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c) Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

24.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT LOCATION, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

25.     *Probable cause.*  I submit that if a computer or storage medium is found at the SUBJECT LOCATION there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a)  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b)  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c)  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts

15

from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d) Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

26. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT LOCATION because:

a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b) As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from

16

further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or

17

consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e) Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

27.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

18

a) The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b) Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c) Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

19

29.     Because more than one person shares the SUJBECT LOCATION as a residence, it is possible that the SUBJECT LOCATION will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## **CONCLUSION**

30.     I respectfully request the issuance of a search warrant authorizing any agent of the Drug Enforcement Administration, with the assistance of other law enforcement officers, to enter and search the premises and property described in Attachment A for items more particularly described in Attachment B, all of which are evidence of and fruits and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1).  Also to be searched is the surrounding curtilage, since I know that drug dealers often have separate "stashes" of drugs hidden and or buried on the property to minimize the dangers of theft or law enforcement activity.  This also applies to the storage of bulk US currency.  Drug dealer's often secret bulk currency is several locations in order to minimize the danger of seizure or theft.  Also to be searched are any vehicle(s) parked directly on the premises.  I know through my training and experience that drug dealers often hide or otherwise conceal their drugs in and on vehicles to be transferred to other locations and to keep them out of their residences in order to distance themselves from the drugs.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

_____

Jeffrey A. Mauldin

Special Agent

Drug Enforcement Administration

20

Sworn to before me, and subscribed in my presence on this _6th_ day of July in the year 2016 in Albuquerque, New Mexico.

Karen B. Molzen

United States Magistrate Judge

21

# **ATTACHMENT A**

### **Location To Be Searched**

The attached search warrant authorizes the search of the property described below, to include the residence, all attached and unattached storage and outbuildings, all vehicles, and areas in, on, or under which the items to be seized could be concealed.

> The residence is located at 1703 Camino Del Sol, Gallup, New Mexico. The residence is more particularly described as a single-family dwelling, specifically a red brick and tan siding bi-level house. The residence is mostly surrounded by a white picket fence around the front and a wooden stockade fence around the back. There are two separate white garage doors on the south end of the residence which face east. The front door is near the middle of the residence at the junction of the single story and two story section of the house. The numeric numbers for the residence are clearly visible to the north of the front door on the lower portion of the second story. The property in its entirety is hereafter referred to as "the SUBJECT LOCATION."



## ATTACHMENT B

## Items To Be Seized

1. Records of money laundering and drug records, in particular, ledgers, drug transactions, account books, notes, names and/or code names or nicknames and/or identifying information reflecting customers, amounts of drugs bought and sold, amounts of money paid, owed or collected and all appointment calendars.

2. Large amounts of U.S. currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

3. Any and all drug customer lists, dealers lists, or any notes containing the individual names of such persons, telephone numbers and/or addresses of these customers or dealers and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

4. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

5. Telephone toll records for homes and/or business owned or controlled by Ernest MADRID or other telecommunications instruments used by them and/or their drug trafficking associates.

6. Indications of ownership or control of these premise and/or other premises used in unlawful drug trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

7. Indications of ownership or control over any vehicles located at the place to be searched, including but not limited to, titles, registration, gas receipts, repair bills and keys belonging to that vehicle.

8. Any and all-paging devices, cellular phones and bills or receipts relating to the leasing/renting of the paging devices and cellular telephones.

9. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received or sent, passbooks, bank checks, safe deposit box key(s), vault key(s), safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

10. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

11. Books, records, receipts, diaries, notes ledgers, airlines tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

12. Photographs or video movies of by Joseph DONALDSON, or his co-conspirators and the property and assets purchased with drug proceeds.

13. Other financial records which may include airline tickets receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

14. Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons.

15. Any controlled substances enumerated in USCS Title 21 § 812 for which possession without proper prescription, registration or authorization is illegal and in violation of § 841, except as authorized by Title 21 USCS.

16. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.   evidence of the lack of such malicious software;

    d.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    e.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

    f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    g.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    h.   evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.